NOT DESIGNATED FOR PUBLICATION

No. 122,554

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
I.H. and I.H.,
Minor Children.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed July 10, 2020. Affirmed.

*Rachel I. Hockenbarger*, of Topeka, for appellant natural father.

*Kate Duncan Butler*, assistant district attorney, and Charles E. Branson, district attorney, for appellee State of Kansas.

Before GARDNER, P.J., BRUNS and WARNER, JJ.

PER CURIAM: Father appeals the termination of his paternal rights to his children I.H. and I.H. Father argues that the district court erred in finding him unfit and in finding termination was in the children's best interests. Yet, because the record supports the district court's findings, we affirm.

*Factual and Procedural History*

Father has been incarcerated since May 2012, before the birth of I.H. and I.H., twin brothers. He has never met his children. And his earliest possible release date is September 2024.

1

*CINC proceedings*

In July 2018, the Kansas Department for Children and Families (DCF), under the district court's Ex Parte Order, removed I.H. and I.H. from Mother's custody. After the State filed a petition to find the children in need of care (CINC), the district court placed the children into DCF's temporary custody.

Before this case, there had been no legal determination of the children's father. The State's petition noted Mother had previously alleged it to be Father. Yet at the temporary custody hearing, Mother testified that her fiancé was their father. No father was listed on the children's birth certificate, and no DNA testing had been done at that point. The district court ordered Mother's fiancé to participate in family services and take a DNA paternity test. The only order regarding Father was that he "participate in services available to him while incarcerated."

A few days after the order, Father wrote the district court requesting a DNA test to prove his paternity. He also asked the court to place the children with his adult daughters or his mother (Grandmother).

In September 2018, Mekell Stowe, the KVC Health Systems (KVC) caseworker, reported to the district court that Father would be unable to care for the children as he is incarcerated until 2024. She stated that Father's compliance with the order to participate in services available to him while incarcerated was unknown. The report also noted that the children considered Mother's fiancé to be their father.

The district court held the adjudication hearing. Mother defaulted. But the district court continued the hearing as to the potential biological fathers and ordered Father to take a DNA test. In October 2018, Father's DNA test revealed him to be the children's father.

In mid-November, Stowe again reported that Father's compliance with the court's order was unknown. Stowe had left a message with Father's counselor to try to set up a phone call. That same month, the district court established Father's paternity.

In December 2018, Father filed another letter with the district court asking for Grandmother to take temporary custody. Stowe's December case report noted that she tried to contact Father's counselor at the El Dorado Correctional Facility several times. When Stowe did not hear from Father or his counselor, she sent Father a letter. Her report again indicated his compliance with the district court's order was unknown. Stowe also included Father's Kansas Adult Supervised Population Electronic Repository (KASPER) report, which showed that Father was serving sentences for aggravated burglary, criminal possession of a firearm, robbery, conspiracy to rob, and attempted robbery. It showed Father had 85 disciplinary infractions, dating from December 2013 to November 2018. These infractions included reports for fighting, battery, lewd acts, undue familiarity, contraband, and insubordination. And it indicated Father's earliest possible release date was July 29, 2024.

In January 2019, Father entered a no-contest statement to the allegations in the petition. The district court adjudicated the children as CINC, ordered the children be told of their Father's identity in a therapeutic setting, and ordered KVC to initiate visits with their paternal grandparents and consider them as a placement.

*Post-adjudication events*

In Stowe's April case report, she stated she had been unable to contact Father and sent Father another letter. Her report again indicated his compliance with the district court's order was unknown. She also noted that the children had begun visits with their paternal grandparents. Yet the grandparents had canceled two visits, were a no-show for

3

one, and, on another occasion, brought relatives with them and did not have room in the car for the children.

In May 2019, the district court changed the permanency plan from reintegration to adoption and ordered family visitations at KVC's direction.

Twenty days later, Father wrote Stowe a letter. He asked to see or to write his children and asked her to give temporary custody to Grandmother, as she had been a foster parent before. Father noted he received a letter from Stow in April of 2019 and had not heard from his attorney.

In June 2019, The State moved to terminate the parental rights of both Mother and Father. As grounds to terminate Father's parental rights, the State asked the district court to consider:

- Father's conviction of a felony and imprisonment, K.S.A. 2019 Supp. 38-2269(b)(5);
- the reasonable efforts of DCF, KVC, and other community agencies to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7);
- the parents' lack of effort in the past to adjust their circumstances, conduct or conditions to meet the needs of the children, K.S.A. 2019 Supp. 38-2269(b)(8);
- the parents' failure to maintain regular visitation, contact or communication with the children or with the custodian of the children, K.S.A. 2019 Supp. 38-2269(c)(2); and
- the parents' failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home, K.S.A. 2019 Supp. 38-2269(c)(3).

4

The State argued that the court should presume Father unfit under K.S.A. 2019 Supp. 38-2271(a)(13) because he had failed or refused to assume the duties of a parent for "two consecutive years next preceding the filing of the petition." And the State alleged Father had not maintained regular contact with KVC during the case or for years before the case was filed. It also asserted his compliance with the court's order was unknown due to his lack of contact with KVC.

On June 24, 2019, Stowe wrote Father in response to a letter she received on June 6, 2019. Father had requested to visit and write the children. Yet, Stowe informed him that the children's therapist did not recommend contact with him at that time because it would be too much for them to comprehend without having negative emotional and behavioral effects.

Stowe's July report noted her correspondence with Father and her recommendation that visits with parental grandparents should continue only if grandparents were to retain custody. Her report again indicated Father's compliance with the district court's order was unknown.

Also in July, the district court terminated Mother's parental rights and continued Father's evidentiary hearing.

On August 21, 2019, Father wrote the district court a letter claiming his attorney was ineffectively representing him.

Six days later, Stowe submitted another report. This report did not include the court's order for Father to participate in services provided while incarcerated. Stowe reported that, due to Father's incarceration and her initial difficulty contacting him, she did not submit a referral for a parenting and psychological evaluation, as she had done for Mother. The report also included an updated KASPER report that included five new

5

disciplinary reports, the most recent on July 5, 2019, and indicated Father's earliest possible release date was now September 5, 2024.

Stowe reported she received a letter from Father on July 16, 2019. In the letter, Father stated Mother had left him when she was five months pregnant. Because he was incarcerated in May 2012, he had never met the children and had no prior "positive relationship" with them. Yet he wanted to build one and wanted Stowe to read them his letters, as he had done through a caseworker with another child. He wanted to know what the therapist's problem was with the children "getting to know a real man." Stowe responded on August 8, 2019, telling Father she had contacted the children's therapist, who again did not recommend contact with Father.

*Termination hearing*

The district court held a hearing on Father's termination of parental rights in September 2019. The State admitted the children's case plans, Stowe's reports, which included Father's letters to Stowe, and documents showing Father's prior convictions.

Father testified that he never doubted he was the children's father and had been trying to prove his paternity since before their birth. When asked how he tried to prove his paternity, he stated, "I've wrote every letter I could to every agency and all I keep hearing is I'm domestic violence prone." He confirmed that he had never paid child support, had never given them a gift, and had never provided them support of any kind. He acknowledged that he had been in jail or prison for the children's entire lives, his release date was still five years away, and he had disciplinary issues. The only information he knew about the children is what Grandmother shared with him and what he read in the case plans. He had never spoken to them. He had sent Stowe around twelve letters, but she claims she only received two.

Father did not see any reason the children could not meet him while he was in prison. He stated his incarceration would not be a problem, as he was "the best father that anybody has in America." He testified he had been taking parenting classes for the last several months and planned on supporting the children through Social Security, disability income, and familial support. He did not wish the children to be in the system the rest of their lives and wanted to exercise his parental rights after his release.

Grandmother testified that her health did not pose a barrier to her caring for the children and that she had the housing and financial ability to do so.

Stowe testified about the children's improvement during DCF's intervention. While the children had initially demonstrated defiance and destructive behavior, DCF custody had benefitted them. They were receiving the stability, therapy, medicine, and school support they needed.

Concerning Father, Stowe had received only four letters and spoke to him only once over the phone in April 2019. She explained that KVC had suspended the visits with the children's paternal grandparents because they did not consistently attend meetings, did not communicate with KVC, and had canceled visits with such short notice that the children were already waiting for them to arrive. On the therapist's recommendation, Stowe ended their visits. DCF later informed her that it had denied placement with the grandparents. Every person whose name Father had given for temporary custody either told KVC they would not take the children or DCF vetted and denied them.

Stowe said leaving the case open to wait for the Father's release would negatively affect the children. They needed stability, consistency, love, support, and understanding, as well as an available advocate to meet their needs.

Ultimately, the district court found by clear and convincing evidence that Father was unfit "by reason of conduct or condition which renders him unable to care properly for a child and the conduct is unlikely to change in the foreseeable future." It based that finding on the following law and facts:

- Father has been convicted of a felony and is imprisoned. K.S.A. 2019 Supp. 38-2269(b)(5).
- Reasonable efforts made by appropriate public or private agencies have failed to rehabilitate the family. K.S.A. 2019 Supp. 38-2269(b)(7).
- Father's lack of effort to adjust his circumstances, conduct or conditions to meet the needs of the children. K.S.A. 2019 Supp. 38-2269(b)(8).

The district court explained:

"Father entered Kansas Department of Corrections (KDOC) custody on June 24, 2013 and prior to that time was in Shawnee County custody starting May 2, 2012 per his testimony. The children were born [before Father's incarceration]. Father has not been a presence in the children's lives since they were born, has never met or talked to them, and has never provided money or items towards their care. Father has felony convictions for robbery, aggravated burglary, criminal possession of a firearm, attempted robbery, and conspired robbery. Father has numerous KDOC Disciplinary Reports, which negatively affect his ability to earn good time credit and hence shorten his sentence. Because Father will continue to be in KDOC custody until at least 2024, Father will be unable to change his circumstances or take the appropriate steps and efforts necessary to care for the children in the foreseeable future. In addition to their basic needs, the children have special behavioral and educational needs, none of which Father is able to meet at this time or in the foreseeable future.

"Father's circumstances are unlikely to change in the foreseeable future due to his long time and ongoing incarceration. The children cannot wait five years for permanency. The agency had numerous services available to the parents, including mental health and

8

drug evaluation and treatment, transportation assistance, drug testing, case management, and more. Father was not able to make use of the available services due to being incarcerated for the duration of these cases.

". . . Considering the physical, mental or emotional health of the children, termination of Father's parental rights is in the best interests of the children named above and the physical, mental or emotional needs of the children would best be served by termination of Father's parental rights. The children have made great strides in their behavior since being removed from their mother's home and placed in DCF custody in July of 2018. The children are responding very well to the stability they now have. It is in the children's best interest[s] and it would best support their physical, mental, and emotional needs to have permanency in a loving and stable home. The children have never met or spoken to their father and it would be emotionally injurious to have contact with him at this time. Furthermore, integration into his home is physically impossible due to his ongoing incarceration."

Thus the district court terminated Father's parental rights.

Father timely appeals.

*Legal Standards*

A parent has a constitutional protected liberty interest in the relationship with his or her child. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (stating the interest of parents in the care, custody, and control of their children is a fundamental liberty interest); *In re B.D.-Y*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, the State may terminate the legal bonds between parent and child only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). If the district court makes such a finding, it must then consider whether termination is in the

best interests of the child. The court's primary concern here is the physical, mental and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1). On appeal, Father contends the district court erred in both its unfitness finding and its best interests finding.

*The district court did not err in finding Father unfit.*

"When this court reviews a district court's finding of unfitness, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

K.S.A. 2019 Supp. 38-2269(a) provides that, once the district court has adjudicated a child as CINC, the district court may terminate a parent's right by a finding of unfitness. The statute lists nonexclusive factors the court must consider in determining unfitness. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2019 Supp. 38-2269(f).

In this case the district court relied on three statutory factors to find Father unfit:

- Father has been convicted of a felony and is imprisoned. K.S.A. 2019 Supp. 38-2269(b)(5).
- Reasonable efforts made by appropriate public or private agencies have failed to rehabilitate the family. K.S.A. 2019 Supp. 38-2269(b)(7).

- Father's lack of effort to adjust his circumstances, conduct, or condition to meet the needs of the children. K.S.A. 2019 Supp. 38-2269(b)(8).

### 1. *Felony conviction and incarceration*

There is no dispute that Father has been incarcerated on felony convictions since the children were born and his earliest possible release date is late summer 2024. So Father does not challenge his incarceration per se. Instead, he contends the evidence shows he made every possible effort to be a part of the children's lives and pursed the available opportunities, to the best of his ability, to carry out his parental duties. Thus, he concludes, the district court should have considered his imprisonment as a mitigating factor and lacked a sufficient factual basis to terminate his rights under K.S.A. 2019 Supp. 38-2269(b)(5).

While imprisonment does not require automatic termination, "imprisonment for a felony alone can result in termination." *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018); see *In re M.H.*, 50 Kan. App. 2d 1162, 1171, 337 P.3d 711 (2014); *In re M.D.S.*, 16 Kan. App. 2d 505, 510, 825 P.2d 1155 (1992). To determine whether this factor should result in termination, the district court considers whether the parent's imprisonment is a mitigating factor or a negative factor. See *In re M.H.*, 50 Kan. App. 2d at 1171; *In re M.D.S.*, 16 Kan. App. 2d at 509-11. These considerations are case specific. See *In re M.H.*, 50 Kan. App. 2d at 1172.

Imprisonment may serve as a mitigating factor if it limits the parent's ability to fulfill their customary parental duties. See *In re S.D.*, 41 Kan. App. 2d 780, 789-90, 204 P.3d 1182 (2009). For example, "incarceration might be cause to excuse a parent's failure to complete certain tasks toward reuniting with a child." *In re M.H.*, 50 Kan. App. 2d at 1172. So we have recognized the district court's duty to consider an incarcerated parent's

11

attempts to care for their children before terminating their parental rights. *In re S.D.*, 41 Kan. App. 2d at 789-90.

Our Supreme Court has addressed this consideration in the contested adoption context:

> "When a nonconsenting parent is incarcerated and unable to fulfill the customary parental duties required of an unrestrained parent, the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability. It is obvious that a parent imprisoned for a long term cannot provide the customary parental care and guidance ordinarily required. If an imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship with his or her children, it is for the trial court to determine the sufficiency of such efforts." *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987):

We have applied this analysis when considering the termination of parental rights. See *In re S.D.*, 41 Kan. App. 2d at 789-90; *In re M.B.*, 39 Kan. App. 2d 31, Syl. ¶ 10, 176 P.3d 977 (2008); *In re M.D.S.*, 16 Kan. App. 2d at 510-11; *In re C.H.*, No. 112,369, 2015 WL 1882223, at *4, (Kan. App. 2015) (unpublished opinion).

In other instances, imprisonment may constitute a significant negative factor,

> "such as where it has impeded the development of a relationship between the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests." *In re M.H.*, 50 Kan. App. 2d at 1172.

To show the district court should have considered his imprisonment as a mitigating factor, Father distinguishes himself from the father in *In re C.H.*, 2015 WL 1882223. There, the father had been in custody most of his child's life and had 10 months

left on his sentence. While incarcerated, the father's only efforts to pursue his parental duties were a couple hours of parenting classes, mailing two letters to his probation officer, and completing a drug education program. Yet he failed to provide evidence of his efforts to contact or maintain a relationship with his child. While we recognized the district court's duty to consider an incarcerated parent's attempts to care for their children, we held that a rational fact-finder could have found it highly probable that the father's incarceration and lack of effort to comply with his court order and maintain contact with his child rendered him unfit. 2015 WL 1882223, at *4, 7.

While Father correctly notes that he presented more evidence of his attempt to contact his children and start a relationship with them than the father in *In re C.H.*, this does not mean the district court lacked a sufficient factual basis to find Father unfit under K.S.A. 2019 Supp. 38-2269(b)(5). The parties here presented both mitigating evidence and negative evidence regarding Father's incarceration. And whether to weigh this evidence for or against Father was in the district court's purview. See *In re M.H.*, 50 Kan. App. 2d at 1171. Under our standard of review, we do not reweigh the evidence but view the record in light most favorable to the State. See *In re B.D.-Y.*, 286 Kan. at 705.

The State presented evidence that showed Father's incarceration as a negative factor. Father has been incarcerated for his children's entire life. See *In re M.H.*, 50 Kan. App. 2d at 1172 (weighing negatively father's lengthy incarceration that had been for most of the child's life). He has never met them. He has never talked to them. And he has never performed any customary parental duties. As he admitted, he only knew about the children through Grandmother and what he read in the case plans and has never provided for them in any material way. He will continue to be incarcerated until at least 2024. Waiting for Father's release would delay the resolution of the children's case by five years and, as Stowe testified, have a negative effect on the children. See *In re K.L.B.*, 56 Kan. App. 2d at 447-48 (weighing negatively the delay of children's proceeding to allow Mother to complete her legal obligations).

13

Viewed in the light most favorable to the State, the record shows clear and convincing evidence that Father's incarnation made him unfit to care properly for the children—now and in the foreseeable future.

2. *Reasonable efforts made by appropriate public or private agencies failed to rehabilitate the family.*

K.S.A. 2019 Supp. 38-2269(b)(7) requires the relevant agencies to try to achieve, within reason, rehabilitation of the family. As our court has stated on several occasions, this factor does not "'require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan.'" *In re A.Z.*, No. 119,217, 2019 WL 638271, at *7 (Kan. App. 2019) (unpublished opinion); *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion).

Father asserts the agencies set Father up for failure because his case plan was not specific, listing only that "[Father] will participate in services available to him while incarcerated," and the agencies did not provide Father with any services. Thus, he concludes, the State failed to establish by clear and convincing evidence that the agency made any reasonable efforts.

Yet KVC and DCF took reasonable steps to rehabilitate Father's relationship with the children. Again, we view the record in the light most favorable to the State. See *In re K.W.*, 45 Kan. App. 2d at 354. On many occasions, Stowe tried to contact Father in prison, by phone and mail, but received no response. Father's first contact with Stowe appears to be, at the earliest, in late May 2019—six  months after the district court established his paternity. So the record does not show that the failure to communicate about the services available to Father rests with the agencies. And, as Father admitted, at some point he received the case plans and began taking parenting classes.

Further, Stowe worked on introducing the children to Father and his family. They were made aware of Father in a therapeutic setting. But contact with Father was not advisable, as the therapist stated it would have a negative effect on the children's emotional health and behavior. At Father's request, Stowe tried to establish a relationship between Father's parents and the children. Yet this fell through because the grandparents were unable to meet with the children and the children's therapist advised that meeting with them was not in the children's best interests. And Stowe investigated placement with each relative Father suggested. But for one reason or another, those placements would not work.

Thus the record shows clear and convincing evidence that despite the reasonable efforts made by Stowe and the agencies, these efforts failed to foster a relationship between the children and Father.

3. *Lack of effort to adjust his circumstances, conduct, or condition to meet the needs of the children*

Father argues that the district court's finding under K.S.A. 2019 Supp. 38-2269(b)(8) for "[l]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" was wrong. He alleges "[t]his finding, on its face, is a contradiction—it says Father has failed to adjust his circumstances that cannot be adjusted or changed."

But Father's point is misguided. First, K.S.A. 2019 Supp. 38-2269(b)(8) is a disjunctive. The district court may consider Father's effort to adjust his circumstances *or* his conduct *or* his condition. Even if it were true that Father could not adjust his circumstances or condition, the record supports that Father failed to adjust his conduct. Second, Father challenges the district court's finding that focused on Father's future condition:  "Father will be unable to change his circumstance or take appropriate steps

15

and efforts necessary to care for the children in the foreseeable future." But K.S.A. 2019 Supp. 38-2269(b)(8) focuses on the past efforts made by the parent to adjust their circumstances. And the record shows Father's past failure.

Father testified he knew since the children's birth that he was potentially their father. He never doubted his paternity. Despite this, he never provided support for his children, gave them a gift, or helped materially, even after his paternity was confirmed. And, even after learning of his paternity, Father continued to receive disciplinary reports, which, as the district court noted, negatively affected his ability to earn good time credit and shorten his sentence. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982) (stating parental unfitness can be judicially predicted from a parent's history).

Although the record indicates Father took parenting classes, tried to arrange temporary custody, and attempted to be a parent for the children from prison, the district court did not weigh this evidence in Father's favor. And we do not reweigh conflicting evidence. *In re B.D.-Y.*, 286 Kan. at 705.

Taking these factors together, we conclude that a rational fact-finder could find it highly probable that Father's rights should be terminated because he was unfit to parent children due to his conduct and condition and this would be unlikely to change in the foreseeable future. Thus, the district court did not err.

*The district court did not err in finding that termination of Father's parental rights was in the best interests of the children.*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the

16

court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

The district court makes this decision based on a preponderance of the evidence. And the decision rests in the sound discretion of the district court. So we review those decisions for an abuse of discretion. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019). A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, 550-51, 256 P.3d 801 (2011).

Father asserts the district court did not consider the effects of termination on the mental and emotional health of the children because it did not consider the effect of separating them from Father at a young age. Yet the district court did consider the children's relationship with the Father and determined that meeting Father "would be emotionally injurious" and "integration into his home is physically impossible due to his ongoing incarceration."

The district court decided it was in both children's best interests to terminate Father's parental rights because permanency in a loving and stable home would best

support their physical, mental, and emotional needs, and contact with their Father would be harmful. The record supports that finding.

Stowe's reports showed that one child suffered from adjustment disorder with mixed anxiety and depressed moods, while the other had Attention Deficit Hyperactivity Disorder. Before their current placement, the children were angry, defiant, and destructive. Yet Stowe testified that after the children had been in a stable environment for about a year, they had turned 180 degrees and were doing "incredibly well." Stowe also testified that keeping the children's case open for an additional four or five years would negatively affect them. And, as the children's therapist cautioned, meeting Father would cause problems for the children because they are not at a cognitive and emotional place to understand the situation.

Thus, the district court reasonably found that termination of Father's parental rights was in the best interests of the children. We find no abuse of discretion.

Affirmed.